## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JANET THOMPSON**,
an individual

       Plaintiff,

      vs.                              No. **CIV 03-0769 MCA/LFG**

**CITY OF ALBUQUERQUE**,
a local public body, **JIM BACA**,
individually and in his former
official capacity as Mayor of the
City of Albuquerque, et al.,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on *Defendants' Motion to Dismiss* [Doc. 4], filed July 30, 2003; *Plaintiff's Motion for Summary Judgment on Counts VI, VII and VIII* [Doc. 45], filed May 3, 2003; and *Defendants' Motion for Summary Judgment* [Doc. 48], also filed May 3, 2003. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court **grants in part** and **denies in part** *Defendants' Motion to Dismiss*, **denies** *Plaintiff's Motion for Summary Judgment on Counts VI, VII and VIII*, and **grants in part** and **denies in part** *Defendants' Motion for Summary Judgment*.

## <u>I. BACKGROUND</u>

On June 30, 2003, Janet L. Thompson, D.V.M. (Dr. Thompson) filed a *Complaint for Damages for Deprivation of Constitutional Rights, Unlawful Retaliation and State Law*

*Claims* [Doc. 1]. In her *Complaint*, Dr. Thompson alleges that the City of Albuquerque (the City); former Mayor James Baca; Lawrence Rael, the City's Chief Administrative Officer; Vicki Fisher, the City's Deputy Chief Administrative Officer; and Sarah Kotchian, Director of the City's Environmental Health Department, retaliated against her in violation of her First Amendment rights and deprived her of liberty and property interests in violation of her Fourteenth Amendment rights to procedural and substantive due process. Dr. Thompson also brings state-law claims for breach of employment contract, breach of the implied covenant of good faith and fair dealing, equitable estoppel, and punitive damages. [Doc. 1 at 2-3, 12-19].

As alleged in the *Complaint*, Dr. Thompson was hired March 18, 1985 as a veterinarian in the City's Environmental Health Department (EHD), Division of Animal Services (ASD). [Doc. 1 at 3]. Dr. Thompson was relieved of her duties on July 14, 2000, allegedly as a result of City officials' decision to make her the scapegoat for highly critical findings set forth in a report drafted by the Humane Society of the United States (HSUS) following a site visit by HSUS personnel. [Id. at 5, 10]. This site visit and the ensuing findings condemning the handling of shelter animals and shelter euthanasia methodology came as a consequence of the 1998 filing of a state-court lawsuit by animal- rights activist Marcy Britton, alleging that shelter employees practiced inhumane animal care, treatment, and euthanasia. [Id. at 4]. According to Dr. Thompson, City officials knew that Britton's allegations were untrue and that allegations included in the HSUS report were false, unfounded, and/or exaggerated. [Id. at 5, 7]. Despite such knowledge and in violation of a

2

court order prohibiting the dissemination of the HSUS report, Defendant Baca and/or Defendant Rael ordered the report released to the media. [Id. at 7]. A June 13, 2000 article in *The Albuquerque Journal* quoted Baca as being angered by the report and vowing immediate changes at the shelters, including possible personnel action. [Id. at 7-8].

The same day the *Journal* article ran, EHD and ASD officials held a meeting to discuss the HSUS report. Dr. Thompson and Defendants Fisher and Kotchian were among those in attendance. At some point during the meeting, Dr. Thompson made clear her strong disagreement with the report and expressed concern that, for various reasons, implementation of the HSUS proposals would likely endanger shelter personnel, shelter-housed animals, and the community at large. [Doc. 1 at 8-9]. According to Dr. Thompson, Fisher then stated that "anyone who was sufficiently uncomfortable with the . . . plan to accept and comply with HSUS' criticisms and recommendations could request and would be granted a transfer to another position." [Id. at 9]. Thereafter, Dr. Thompson, as instructed, requested a transfer. Instead of being transferred, however, Dr. Thompson was informed by Kotchian on June 29, 2000 that the City had elected not to continue her employment. [Id. at 9-10]. A press release of July 6, 2000 and a *Journal* article of July 7, 2000 stated, respectively, that personnel actions had been taken at ASD as part of an overall improvement plan implemented by the City and that the City had released Dr. Thompson from her duties as veterinarian. [Id. at 10]. Believing that she was terminated for voicing opposition to the implementation of the HSUS proposals, Dr. Thompson filed her *Complaint*. [See generally id.].

Defendants now move to dismiss and for summary judgment, arguing that (1) the

3

speech on which Dr. Thompson bases her First Amendment claim did not concern a matter of public concern and, thus, is not protected; (2) Dr. Thompson has not established either a protected liberty or a protected property interest; (3) Dr. Thompson cannot succeed on a breach-of-contract claim because she was an at-will employee; (4) as an at-will employee, Dr. Thompson cannot assert a breach of the implied covenant of good faith and fair dealing; (5) equitable estoppel is not supported by the facts of this case; and (6) there is no basis for awarding punitive damages. [Docs. 4, 5, 48, 49]. The individual Defendants in their individual capacities also move for summary judgment on the basis of qualified immunity, and the City moves for summary judgment on the ground that Dr. Thompson has failed to provide a foundation for municipal liability. [Doc. 49 at 23-29]. Dr. Thompson moves for summary judgment on her claims of breach of contract, breach of the covenant of good faith and fair dealing, and equitable estoppel. [Doc. 45].

## II. ANALYSIS

## A. Standards of Review

### 1. Fed.R.Civ.P. 12(b)(6) and 56(c)

Under Fed. R. Civ. P.12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief may be granted. Dismissal on this ground may occur *sua sponte* or upon a defendant's motion. See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir.), cert. denied, 534 U.S. 922 (2001). When requested in a defendant's motion, dismissal under this rule is appropriate only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" GFF Corp. v. Associated

Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir.1997) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir.1991).   Accordingly, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party.  GFF Corp., 130 F.3d at 1384.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  See id. at 248.  Judgment is appropriate as a matter of law if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex Corp., 477 U.S.

at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998). "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotation omitted). Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).

### 2. Qualified Immunity

The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 516 (10th Cir. 1998) (internal quotations omitted). "In the context of a summary judgment motion, to prevail against a qualified immunity defense, the plaintiff must 'come forward with facts or allegations to show both that the defendant's alleged conduct violated the law and that the law was clearly established when the violation occurred.'" Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1026 (10th Cir. 1994) (quoting Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 646 (10th Cir.1988). Only if the plaintiff satisfies both elements does the defendant bear the normal burden of the summary-judgment movant of showing that no material factual issues remain to defeat his claim of qualified immunity. Id. A plaintiff

ordinarily demonstrates that a law is clearly established by showing a Supreme Court or Tenth Circuit decision on point, or that the clearly established weight of authority from other courts has determined the law to be as the plaintiff maintains. Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir.1992); see also Anderson v. Creighton, 483 U.S. 635, 640 (1987) (a right is clearly established if the contours of the right are "sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right.")

The plaintiff's burden in this situation is not a light one. Jantz v. Muci, 976 F.2d 623, 627 (10th Cir. 1992) ("A defendant government official need only raise the qualified immunity defense to shift the summary judgment burden to the plaintiff.  This burden is quite heavy, for the plaintiff must do more than simply allege the violation of a general legal precept.")  A district court's determination as to whether the right is clearly established often turns on the level of generality to be applied, for "[o]n a very general level, all constitutional rights are clearly established." Horstkoetter v. Dep't of Public Safety, 159 F.3d 1265, 1278 (10th Cir. 1998).  For example, in Anderson v Creighton, the United States Supreme Court noted that the Fourth Amendment right to be free from unreasonable searches and seizures was clearly established, but held that it was not clear whether the Fourth Amendment's protections extended to the particular factual situation at issue in that case.  Id. (citing Anderson, 483 U.S. at 639-40).   Indeed, an overly general approach "would destroy 'the balance that . . . cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties[,]" and allow plaintiffs

"to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."   Anderson, 483 U.S. at 639 (quotation omitted).  To address this concern, the Tenth Circuit requires some, but not necessarily precise, factual correspondence between the cases cited by a plaintiff and the factual situation at hand.  Horstkoetter, 159 F.3d at 1278 (internal quotation omitted).

## B. Dr. Thompson's Federal Civil Rights Claims Under 42 U.S.C. § 1983

In her *Complaint*, Dr. Thompson asserts several causes of action under 42 U.S.C. § 1983.  [Doc. No. 1 at 12-16].  Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Because 42 U.S.C. § 1983 is not an independent source of substantive rights, but rather a mechanism for enforcing federal rights conferred elsewhere, the analysis of the claims asserted in Dr. Thompson's *Complaint* necessarily begins by identifying the specific federal constitutional rights Defendants are alleged to have violated.  See Graham v. Connor, 490 U.S. 386, 393-94 (1989); Reno v. Flores, 507 U.S. 292, 302 (1993).

### 1. Retaliation in Violation of the First Amendment (Count I)

Dr. Thompson contends that she was terminated for having voiced opposition to the implementation of HSUS's proposed recommendations with respect to the euthanasia of animals in the custody of city shelters.  [Doc. 1 at 8-10].  Defendants assert that Dr.

Thompson's statements did not involve a matter of public concern and that her interest in making them does not outweigh the City's interest in regulating her speech. [Doc. 49 at 12-15]. Defendants contend that because Dr. Thompson has not established a prima facie case of retaliation in violation of the First Amendment, they are entitled to dismissal or summary judgment on Count I.

Analysis of a public employee's claim of retaliation in violation of the First Amendment begins with a review of the four-prong test articulated in Pickering v. Bd. of Educ., 391 U.S. 563 (1968) and Connick v. Myers, 461 U.S. 138 (1983). The court first asks whether the speech at issue concerns a matter of public concern, which requires an examination of the content, form, and context of a given statement, as revealed by the whole record. Connick, 461 U.S. at 147-48. The court should also consider whether the speech at issue is directed at a public issue or is merely an attempt to redress personal grievances, because to be protected, speech must fairly relate to a matter of political, social, or other community concern. Id. at 146; see also Schalk v. Gallemore, 906 F.2d 491, 495-96 (10th Cir. 1990). Importantly, because a determination that speech is of public concern is not contingent on the speaker's particular audience, employees do not lose First Amendment protections simply because they choose not to "go public" with their allegations. Paradis v. Montrose Memorial Hosp., 157 F.3d 815, 818 n.1 (10th Cir. 1998).

The Tenth Circuit has described the public-concern requirement as "only one step in a multi-tiered analysis applicable to claims that a public employer has terminated an employee in violation of her First Amendment rights." Paradis, 157 F.3d at 818. After

making this initial determination, the court is charged with balancing the interests of the employee in making the statement against the employer's interest "in promoting the efficiency of the public services it performs through its employees." Id. (internal quotation omitted). A plaintiff must next show that the speech was a motivating factor in her termination, though the employer can still prevail if it shows that it would have made the same decision regardless of the protected speech. Id. The first two steps (determining whether the speech involves a matter of public concern and balancing the interests) in this four-step analysis involve legal questions, which the court resolves to determine whether the speech is constitutionally protected. The second two steps (determining whether the speech was a motivating factor in the termination and whether the same decision would have been made absent the protected speech) concern causation and involve questions of fact. Dill v. City of Edmond, Okl., 155 F.3d 1193, 1202 (10th Cir. 1998) (citation omitted).

The disputed speech in this case includes Dr. Thompson's statements that implementing some of the changes proposed by HSUS would be harmful to (1) animals housed at city shelters, to the extent that HSUS's suggested methods of euthanasia were less humane than those already practiced; (2) workers, who would now be put at greater risk of being scratched, bitten, or otherwise harmed; and (3) the community at large, due to an increased likelihood of escaped feral animals. [Doc. 1 at 8-9]. Specifically, Dr. Thompson explained that policies and procedures already in place were "humane for the animal[s], safe for the kennel staff, and practical for the realities of budget constraints, chronic staff shortages, staff feelings about euthanasia, numbers of animals euthanized, and physical

10

limitations of our facilities." [Doc. 59 at 11, Plaintiff's Exh. C3]. Defendants submit that Dr. Thompson's statements reflect nothing more than "matters of a personal interest [and] a purely internal dispute." [Doc. 5 at 6]. Defendants also attach significance to the fact that Dr. Thompson failed to make these statements anywhere other than at a personnel meeting between shelter staff and City officials. [Id. at 7].

The Court is unpersuaded by Defendants' arguments and notes that Defendants concede that "the issue of how animals were being treated at the animal [is] a matter of public concern." [Doc. 5 at 6]. The Court reads Dr. Thompson's statements as expressions of doubt and concern as to the wisdom of Defendants' decision to set in motion changes that she, as a licensed veterinarian, considered potentially harmful not just to city-housed animals but to shelter workers and the community in general. In referencing budget constraints, Dr. Thompson also appears to express a concern as to the financial burden to be borne by those whose support keeps city shelters afloat. So read and understood, there can be little doubt that Dr. Thompson was voicing her professional belief that implementation of the HSUS proposals would likely prove injurious not just to those directly connected to the shelter but to members of the outside populace as well. Accordingly, the Court finds that rather than evidencing "a purely internal dispute," the statements at issue involve clear matters of public concern, the First Amendment protections surrounding which are neither limited nor negated by Dr. Thompson's failure to express herself anywhere other than at an employee staff meeting. See Paradis, 157 F.3d at 818. The Court notes that the meeting at which Dr. Thompson voiced her concerns was convened to review the substance of the HSUS proposals

11

and plan for their implementation.

In light of its finding that Dr. Thompson's statements addressed a matter of concern, the Court next balances Dr. Thompson's interest in making her statements against "the interest of the [City], as an employer, in promoting the efficiency of the public services it performs through its employees." See Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). In balancing the interests, courts ordinarily will defer to a public employer's reasonable predictions of workplace disruption, "but those predictions must be supported by the presentation of specific evidence. The [employer] cannot satisfy its burden by making 'purely speculative allegations.'" Cragg v. City of Osawatomie, Kan., 143 F.3d 1343, 1347 (10th Cir. 1998).

The Court finds that Defendants have not presented specific evidence in support of their claim that Dr. Thompson's statements were likely to interfere with the smooth operation of city shelters. [See Doc. 49 at 14]. At best, Defendants imply that because Dr. Thompson's subordinates attended the meeting at which she voiced her opposition to the implementation of the HSUS policies, those employees likely would have followed Dr. Thompson's lead were she to have refused to implement those policies. [Id. at 15]. The evidence, however, reflects that while Dr. Thompson did not agree with the HSUS policies and expressed discomfort at the prospect of implementing them, she never flatly refused to do so. [Doc. 49, Exh. A at 99]. In fact, Dr. Thompson contends that had she been given the choice between implementing the disputed policies or losing her job, she would have implemented the policies with which she disagreed. [Doc. 59 at 12]. Because Defendants

have failed to point to specific evidence that Dr. Thompson's statements were likely to interfere with shelter operations, the Court concludes that Dr. Thompson's interest in making her statements outweighs the City's interest in promoting the efficiency of shelter services. See Pickering, 391 U.S. at 568.

Turning to the third element of the four-prong Pickering/Connick test, the Court finds that genuine issues of material fact exist as to whether Dr. Thompson's statements were a motivating factor in Defendants' decision to terminate her.  Specifically, Dr. Thompson asserts, and Defendants do not dispute, that Defendant Kotchian's decision to recommend Dr. Thompson's termination was based on a combination of knowing that Dr. Thompson did not support the HSUS recommendations and Dr. Thompson's June 28, 2000 memorandum to her superiors, requesting a transfer and detailing her concerns about what she saw as the likely ramifications of implementing the HSUS proposals.  [Doc. 45 at 8-9, Exh. 1, June 28, 2000 memorandum from Jan Thompson, D.V.M. to Robert Hillman, ASD Manager; Exh. 2, Apr. 1, 2004 deposition of Sarah Kotchian, at 15; Doc. 57 at 3].  Kotchian also testified that at the June 13, 2000 staff meeting, she had not yet decided to recommend Dr. Thompson's termination.  [Doc. 45, Exh. 2, Apr. 1, 2004 depo. of Sarah Kotchian, at 13]. Though Defendants have put forth evidence tending to show that Dr. Thompson was terminated because of her unwillingness to implement the HSUS proposals, the Court concludes that a reasonable inference could also be drawn that Dr. Thompson's strongly expressed reasons on an issue of public concern for her inability to implement the HSUS proposals motivated Defendants' decision to dismiss her.  [Compare Doc. 49 at 15,

13

"Plaintiff's speech indicated her disapproval of the City's position yet it was plaintiff who was responsible for carrying out the City's directives. The City had a right to choose a particular direction and to replace its veterinarian with one who would follow that direction[]" and Doc. 67 at 12, "Defendants agree that plaintiff was discharged because she made the comments at the June 13, 2000 meeting and reiterated them in her June 28, 2000 memo."]

The individual Defendants contend that they are entitled to qualified immunity. [Doc. 49 at 23-27]. As explained above, an individual defendant's assertion of qualified immunity will bar a claim for damages unless the plaintiff demonstrates the defendant's actions violated a federal constitutional or statutory right that was clearly established at the time of the conduct at issue. Jantzen v. Hawkins, 188 F.3d 1247, 1258 (10th Cir. 1999). In this case, Defendants submit that Dr. Thompson has demonstrated no constitutional violation and, even assuming she has, she has shown no clearly established law that would have alerted Defendants to the unlawfulness of their conduct. The City similarly argues that Dr. Thompson has shown no basis for municipal liability. [Doc. 49 at 25, 27]. Dr. Thompson counters that Fisher and Kotchian[1] "could not seriously have believed" that they could

_____

[1] In *Plaintiff's Response to Defendants' Motion for Summary Judgment and Memorandum in Support Thereof*, Dr. Thompson challenges only Fisher's and Kotchian's entitlement to qualified immunity. [Doc. 59 at 18-21]. The Court treats Dr. Thompson's failure to challenge Baca's and Rael's claims of qualified immunity as an abandonment of her argument on that issue. See Phillips v. Calhoun, 956 F.2d 949, 953-54 (10th Cir.1992) (*quoting* Pelfresne v. Village of Williams Bay, 917 F.2d 1017, 1023 (7th Cir.1990)) ("[a] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.")

dismiss her when her refusal to implement the HSUS proposals stemmed, at least in part, from a concern for public safety.

The Court concludes that Fisher and Kotchian are not entitled to qualified immunity with respect to Dr. Thompson's First Amendment claim.  Defendants argue that, because Dr. Thompson's speech "did not disclose wrongdoing or malfeasance" on their part, her speech did not involve a matter of public concern and thus was not protected.  [Doc. 49 at 25; Doc. 5 at 7-8].  The Court, however, believes that Connick, Paradis, and Schalk, all of which are cited above, clearly establish that employee speech touches on a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community."  Schalk, 906 F.2d at 495, quoting Connick, 461 U.S. at 146. The Court further believes that, in light of this precedent, a reasonable official in either Fisher's or Kotchian's place would have recognized that her actions violated Dr. Thompson's First Amendment rights.  Accordingly, the Court finds that Fisher and Kotchian are not entitled to qualified immunity on Dr. Thompson's First Amendment claim.

Dr. Thompson also argues that the final policymaking authority of Fisher and Kotchian, as delegated to them by Rael, was sufficient to subject the City to municipal liability.  She therefore urges the Court to find that the actions of Fisher and Kotchian bind the City.  [Doc. 59 at 17-18].  Defendants respond that "[i]t is undisputed that the only named defendant with the power to hire and fire employees was . . . Rael."  [Doc. 67 at 17]. However, rather than personally make the decision to discharge Dr. Thompson, Rael relied on the recommendation of Fisher and Kotchian that Dr. Thompson be released.  [Id.].

15

In an action brought pursuant to 42 U.S.C. § 1983, a municipality may not be held liable on a theory of respondeat superior. Ledbetter v. City of Topeka, Kan., 318 F.3d 1183, (10th Cir. 2003); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (978). Rather, the plaintiff must show "that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action." Camfield v. City of Oklahoma City, 248 F.3d 1214, 1229 (10th Cir. 2001) (internal quotation omitted). In this case, Dr. Thompson does not challenge as unconstitutional an official City policy or custom. Instead, she submits that "the final decision makers with power to bind the Defendant City were Defendants Fisher and Kotchian and that they had the power to bind the Defendant City." [Doc. 59 at 17-18]. Dr. Thompson cites City of St. Louis v. Praprotnik, 485 U.S. 112 (1988) in support. Praprotnik similarly involved a § 1983 action brought by a city employee allegedly terminated in violation of his First Amendment rights. Praprotnik, 485 U.S. at 114-18. As is relevant here, the Court in that case explained that

> special difficulties can arise when it is contended that a municipal policymaker has delegated his policymaking authority to another official. If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability. If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, *when a subordinate's decision is subject to review by the municipality's authorized*

> *policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.*

Id. at 126-27 (internal citation omitted) (emphasis added).

This Court is persuaded by the reasoning in Praprotnik.  Though he may have delegated some authority to Fisher and Kotchian, Rael's reliance on their recommendations in deciding to terminate Dr. Thompson indicates his approval and ratification of his subordinates' determination.  See  Praprotnik, 485 U.S. at 127.  Because the decision of Fisher and Kotchian, once ratified by Rael, became final, the Court finds that that decision is chargeable to the City for purposes of § 1983.  See id.

**2. Deprivation of  Liberty and Property Interests in Violation of the Fourteenth Amendment's Guarantee of Substantive and Procedural Due Process (Counts II-V)**

**a. Liberty Interest**

Dr. Thompson next alleges that, at the time of the acts in question, she had a constitutionally protected liberty interest in employment opportunities in her chosen field, as well as in her good name, reputation, honor and integrity.  [Doc. 1 at 13].  She asserts that Defendants have deprived her of this liberty interest by defaming her and damaging her professional reputation by (1) releasing to the media HSUS findings that Defendants knew were false, and (2) providing newspaper interviews in which they (a) quoted from the HSUS report, (b) expressed anger and alarm over city shelters' euthanasia methods, (c) called the shelters' veterinary care unacceptable, and (d) implied that Dr. Thompson, whose release

17

was precipitated by the Britton lawsuit, was incompetent.  [Id. at 10, Exhs. 1 and 2; Doc. 7 at 15-17].  Conceding only that they published a statement that Dr. Thompson had been released, Defendants otherwise argue that they have made no false statements and have done nothing to impugn Dr. Thompson's reputation or prevent her from securing future employment as a veterinarian.  [Doc. 5 at 11].

The Due Process Clause of the Fourteenth Amendment prohibits the States from depriving an individual of "life, liberty, or property" without "due process of law." U.S. Const. amend. XIV.  Determining whether the government has deprived an individual of his due process rights involves a two-pronged inquiry.  Garcia v. City of Albuquerque, 232 F.3d 760, 769 (10th Cir. 2000).  First, the court asks whether the individual possessed a protected interest giving rise to due process protection.  If so, the court then must ask whether the government afforded the individual an appropriate level of process.  Id.

In this Circuit, a public employee may claim a valid liberty interest "in his good name and reputation as it affects his protected property interest in continued employment." Garcia, 232 F.3d at 769 (quoting Workman v. Jordan, 32 F.3d 475, 480 (10th Cir.1994)).  This interest, however, is limited inasmuch as the employee must show that the employer took action to terminate based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee' standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities.  Id. at 771-72.  Specifically, the employee must establish that (1) the employer made a statement impugning the employee's good name, reputation, honor, or integrity;

(2) the statement was false; (3) the employer made the statement in the course of termination proceedings or the statement foreclosed future employment opportunities; and (4) the statement was published.  Id. (internal quotation omitted).

In response to Defendants' argument that the statements at issue in this case were not false and did not impugn Dr. Thompson's reputation or good name, Dr. Thompson asserts that "Defendants completely ignore that a person may be unconstitutionally defamed or stigmatized by innuendo." [Doc. 7 at 14].  According to Dr. Thompson, a reasonable reader could draw a defamatory inference from the following: (1) Dr. Thompson was the City's sole veterinarian from 1985 until July 2000; (2) while they knew that Dr. Thompson's euthanasia procedures and practices complied with standards set forth by the American Veterinary Medical Association's Panel on Euthanasia, Defendants chose not to oppose the HSUS findings but, rather, to adopt the HSUS preferred method of euthanasia; (3) the front-page *Journal* article of June 13, 2000 explained that changes to shelter personnel were likely in light of painful and incomplete euthanasia procedures; (4) a headline in the July 7, 2000, edition of the same newspaper read, "City Vet Relieved of Duties," followed by "Plaintiff to Drop Suit Over Shelter Practices"; and (5) the July 7, 2000 article, which explained that Dr. Thompson had been "released," also discussed the poor animal care and unacceptable practices of city shelters.  (Id. at 14-17; see also Doc. 1 at 3, 7-8, 10, Exhs. 1 and 2).

Before addressing the merits of Dr. Thompson's liberty-interest claim, the Court notes the distinctive nature of that claim as compared to those alleged in the cases on which the parties rely.  For example, in Puchalski v. Sch. Dist. of Springfield, 161 F.Supp.2d 395

19

(E.D.Pa. 2001), cited by Dr. Thompson, a high school football coach whose contract was not renewed filed suit pursuant to 42 U.S.C. § 1983, asserting the deprivation of "fundamental rights to his reputation and to continued employment."[2]   Puchalski, 161 F.Supp.2d at 405. In Puchalski, Plaintiff's reputation was allegedly harmed as a result of (1) a newspaper article reporting that he had made a racial slur, and (2) the district superintendent's remarks to the school board stressing the need for the district's athletic teams to (a) exhibit good sportsmanship, (b) avoid "bad" language, (c) serve as role models for students, and (d) work cooperatively with others in the school system.   Id. at 403-04.   In Garcia, cited by Defendants,  the liberty-interest claim arose from a city bus driver's allegation that the city had "sidetracked" his career  by holding to its physician's finding that plaintiff was no longer able to drive a bus.  Garcia, 232 F.3d at 771.

    Dr. Thompson's claim is notable in that, to the extent she challenges the City's acceptance of the HSUS proposals, she does not profess to have been harmed by City officials' direct remarks about her abilities or competency.    Instead, Dr. Thompson's argument is that her professional reputation has been damaged as a result of the City's decision to implement proposals with which she disagreed, and the conclusions she alleges

_____

        [2]  The Puchalski court declared that "[t]here is no constitutionally protected property or liberty interest in reputation."  Puchalski, 161 F.Supp.2d at 406 (citations omitted).  The court went on to explain that "[w]here one is defamed or stigmatized in the course of his dismissal from public employment, however, he does have a cognizable liberty interest . . . [but t]hat interest . . . is not accorded substantive due process protection.  Rather, the right accorded is that of procedural due process, specifically the right to an opportunity to refute the charges and clear one's name."  Id. (citations omitted).  The Puchalski court thus held that a federal constitutional claim arises "not from the defamatory or stigmatization conduct per se but from the denial of a name-clearing hearing."  Id. at 407.

can and have been drawn about her from that administrative decision.  The Court thus finds Dr. Thompson's claim to be somewhat unique in that the harm she alleges squarely implicates the City's authority to make policy, and therefore must be evaluated with an understanding and recognition of the City's overall responsibility to govern.  See N.M. STAT. ANN. § 3-18-3 (Michie 2003) (authorizing municipality to, among other things, prohibit cruelty to animals; regulate, restrain, and prohibit the running at large of animals within municipal boundary; and provide for the impounding and disposition of animals found to be running at large).  With these ideas in mind, the Court now turns to the merits of Dr. Thompson's claim.

As stated above, Defendants concede that the complained-of statements were published.  [Doc. 5 at 11].  Assuming without deciding that Dr. Thompson also has established that those statements impugned her good name or reputation and were made in the course of termination, the Court nevertheless finds that Dr. Thompson has not demonstrated that the statements were false.  The allegedly defamatory statements can be divided into two categories -- those included in the two *Albuquerque Journal* articles and those included in the HSUS report.  [See Doc. 1 at 7-8; Exhs. 1 and 2; Doc. 7 at 14-15; Doc. 59 at 16].  For liability to attach, however, the statements at issue must be capable of being defamatory, meaning the statements must be factual and not merely expressions of opinion.  Schwartz v. Am. College of Emergency Physicians, 215 F.3d 1140, 1145 (10th Cir. 2000).  Whether the statements in question are statements of fact or opinion is a question of law, and the plaintiff bears the burden of establishing falsity.  Id. at 1146.  Moreover, "[m]inor

inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the . . . charge be justified.'"   Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517 (1991).

Despite Dr. Thompson's allegations that the statements in the HSUS report were false, the Court notes that during her deposition, Dr. Thompson testified that there is room for differing opinions with respect to the validity of the positions taken by HSUS.  [Doc. 49, Exh. A, March 3, 2004 depo. of Janet L. Thompson at 169-70].  When asked why she believed it was wrong for the City to have chosen to accept and implement the HSUS proposals, Dr. Thompson responded that "the HSUS position in many instances is not based on science, it is based on emotion . . . ."  [Id. at 169].   She then conceded, however, that others would probably disagree with her own assessment and admitted that there were some recommendations included in the HSUS report with which she agreed.   [Id. at 99, 169].  Dr. Thompson's own testimony supports the conclusion that the complained-of statements included in the HSUS report reflected expressions of opinion, rather than statements of fact. To be sure, Dr. Thompson's express belief that the HSUS report was based on emotion rather than science only serves to reinforce the Court's determination that the HSUS findings represented not hard and provable facts but, instead, one advocacy group's opinion as to the most humane way to care for and euthanize animals.

With respect to the two *Journal* articles, the Court similarly finds that the statements in question either amounted to nothing more than expressions of opinion or were true or substantially true.  For example, Dr. Thompson challenges the following, which appeared in the June 13, 2000 *Journal* article:  "Mayor Jim Baca, angered by a report describing

painful and incomplete euthanasia of animals and poor care at city animal shelters, said Monday that immediate changes are being made at the shelters, including 'possible personnel action.'" [Doc. 7 at 15; <u>see also</u> Doc. 1, Exh. 1].  The Court finds that this statement cannot be considered defamatory, as (1) any report of the former Mayor's anger  is no more than an account of his opinion as to the state of affairs at city shelters, and (2) the announcement of possible personnel action is a true statement.  As for the second article's  headline reading "City Vet Relieved of Duties,"the Court notes that there has been no allegation of untruth in this statement.  [Doc. 7 at 15; <u>see also</u> Doc. 1, Exh. 2].  Instead, Dr. Thompson attaches significance to the fact that because that article reported that she was released, not fired, the only reasonable inference to be drawn from that statement is that she would have been fired if such an action were possible.  [Doc. 7 at 16; <u>see also</u> Doc. 1, Exh. 2].  Assuming that such an inference could be drawn, the Court fails to see a material difference between the terms "release" and "fire."   Webster's Dictionary defines "fire" as "to dismiss from a position; discharge," and "release" as "to set free, as from confinement, duty, work, etc."  WEBSTER'S NEW WORLD DICTIONARY 508, 1132 (3d College Ed. 1988).  Whether the article described Dr. Thompson as having been fired or released, the Court concludes that either would have been substantially true — Dr. Thompson was no longer employed by the City.  <u>See</u> <u>Schwartz</u>, 215 F.3d at 1146 ("substantial truthfulness is a defense to an action for defamation") (internal quotation omitted).  In light of the foregoing, the Court rejects Dr. Thompson's substantive and procedural due process claims based on deprivation of a liberty interest.

**b. Property Interest**

Dr. Thompson also alleges that Defendants deprived her of a constitutionally protected property interest in continued employment with the City, advancing several theories in support of this argument. [Doc. 1 at 15]. First, Dr. Thompson contends that a contract for employment, and, consequently, a protected property interest,[3] was created at the June 13, 2000 staff meeting when she accepted Fisher's offer of a transfer to those employees who were uncomfortable implementing the HSUS proposals. [Doc. 7 at 17]. Dr. Thompson acknowledges that she began her employment as an exempt or unclassified employee; she now argues that Defendants "had the power to and did in fact[] change her status" by virtue of orally extending to her the above-described transfer offer. [Doc. 45 at 14]. In other words, Dr. Thompson contends that the offer of a transfer and her purported acceptance thereof in an of itself represents the functional equivalent of a change in her employment status from exempt to classified.[4] As her final argument, Dr. Thompson, relying on Lovato v. City of Albuquerque, 742 P.2d 499 (1987), maintains that her 15-year term of

---

[3] The overlapping of Dr. Thompson's property-interest and contract claims is made evident by her own *Response to Defendants' Motion for Summary Judgment and Memorandum in Support Thereof*, in which she incorporates by reference into her property-interest argument her *Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment on Counts VI, VII, and VIII*. [See Doc. 59 at 14; Doc. 46 at 14]. In is in the latter document that Dr. Thompson, in a section entitled "Count VI - Breach of Contract of Employment," submits that Fisher's offer of a transfer effectively converted Dr. Thompson's status from exempt to classified. [Doc. 46 at 14].

[4] Adopting a seemingly contradictory position, however, Dr. Thompson later appears to abandon the argument that Defendants somehow transformed her status from that of unclassified employee to classified employee. [See Doc. 72 at 8, "Plaintiff agrees that Plaintiff had no *right*, contractual or otherwise, to be transferred to a *classified* position . . . .] (emphasis in original).

employment with the City was sufficient to create a reasonable expectation of continued employment.  [Doc. 7 at 18].

Defendants counter that Dr. Thompson was an at-will employee, had no legitimate claim to continued employment, and could be terminated at any time and for any reason. [Doc. 49 at 17-18].  Defendants argue that, even assuming Fisher offered to transfer Dr. Thompson, Dr. Thompson has brought forth nothing to show how such a statement would have modified her employment status from unclassified to classified.  [Doc. 8 at 8]. Defendants also dispute the creation of an implied contract of employment, explaining that such a contract will be found to exist only where the terms of the contract are specifically identifiable and the oral representation sufficiently explicit and definite.  [Doc. 57 at 10-12]. Finally, Defendants argue that <u>Lovato</u> does not stand for the proposition for which Dr. Thompson has cited it.  [Doc. 8 at 9].

"The 'standard for the existence of a property right in employment is whether the plaintiff has a legitimate expectation of continued employment.'"  <u>Garcia</u>, 232 F.3d at 769 (<i>quoting</i> <u>Hennigh v. City of Shawnee</u>, 155 F.3d 1249, 1253 (10th Cir.1998)).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  <u>Bd. of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 577 (1972).  Additionally, property interests are created, and their dimensions defined, by existing rules or understandings stemming from an independent source such as state law. <u>Id.</u>

In the instant case, Defendants have attached to one of their pleadings what appear to be relevant sections of the City's Merit System Ordinance.  [See Doc. 49, Exh. 2 to Exh. B].  Paragraph (d) of § 3-1-6, "The Classified and Unclassified Service," explains that "[u]nclassified employees are employees at will and serve at the discretion of the chief Administrative Office[,] . . . have no property interest in continued unclassified employment and may be dismissed for any or no reason."  [Id.].  Veterinarians are specifically listed as unclassified employees.  [Id. at § 3-1-6(C)(4)].  For her part, Dr. Thompson does not dispute that she began her employment with the City as an unclassified employee, but insists that Fisher's alleged offer of a transfer "change[d] her status . . . ."  [Doc. 45 at 14].

As Defendants point out, Dr. Thompson has failed to include any authority from either the City's Merit System Ordinance or elsewhere in support of her apparent contention that an oral representation is sufficient to transform an unclassified employee into a member of the classified service.  To the contrary, in later pleadings Dr. Thompson "agrees that [she] had no *right*, contractual or otherwise, to be transferred to a classified position . . . ."  [Doc. 72 at 8] (emphasis in original).  Continuing, Dr. Thompson explains that "Defendants could have transferred her to any position, or no position . . . ."  [Id.].  Section 3-1-6 of the City's Merit System Ordinance divides city employees into two categories – classified and unclassified.  [Doc. 49, Exh. 2 to Exh. B at § 3-1-6].  It necessarily follows that if a city employee is not a member of the classified service, he or she is a member of the unclassified service.  [See id.].  As explained above, unclassified employees "have no property interest in continued unclassified employment and may be dismissed for any or no reason."  [Id.].

26

Even assuming an enforceable agreement to a transfer, such a transfer could not have ripened into a protected interest because it would have been to another unclassified, at-will position, from which Dr. Thompson could also have been summarily discharged.  Accordingly, the Court rejects Dr. Thompson's substantive and procedural due process claims based on deprivation of a property interest.

## C. Dr. Thompson's State-Law Claims

### 1. Breach of Contract of Employment and Breach of the Implied Covenant of Good Faith and Fair Dealing (Counts VI and VII)

As previously explained, Dr. Thompson believes that a contract of employment was created when, on June 13, 2000, Fisher offered to transfer anyone sufficiently uncomfortable with the prospect of implementing the HSUS proposals, and Dr. Thompson accepted.  [Doc. 1 at 16].  According to Dr. Thompson, Defendants then breached that contract when, on June 29, 2000, they told her that she would not be transferred but fired instead.  Dr. Thompson further submits that, in firing her, Defendants breached the covenant of good faith and fair dealing implied in every contract.  [Id. at 16-17].

Defendants have moved for summary judgment, arguing that even though New Mexico will recognize an implied contract of employment, such a contract will be found to exist only where the terms of the alleged agreement are specifically identifiable and sufficiently firm to fix the parties' responsibilities and liabilities.  [Doc. 49 at 19-20].  Defendants contend that, at best, Fisher made a general statement about transferring dissatisfied employees if possible, but that it was not possible to move Dr. Thompson to the

permanent, classified position she requested.  In light of the indefinite terms of the alleged

contract, Defendants argue no enforceable agreement was created and, absent an enforceable

agreement or contract, they cannot be found to have breached an implied covenant of good

faith and fair dealing.  [Id. at 20-21].  Dr. Thompson has filed a cross-motion for summary

judgment in which she asserts that even though she began her employment with the City as

an unclassified employee, Fisher's offer of a transfer transformed her into a member of the

classified service.[5]  [Doc. 45; Doc. 46 at 14].

 "The general rule in New Mexico is that an employment contract is for an indefinite

period and is terminable at the will of either party . . . ."  Hartbarger v. Frank Paxton Co.,

857 P.2d 776, 779 (N.M. 1993).  However, one of the two exceptions to this rule provides

that "an employer may be liable in damages to an employee . . . where the facts disclose the

existence of an implied employment contract provision that limits the employer's authority

to discharge."  Lopez v. Kline, 953 P.2d 304, 306 (N.M. Ct. App. 1997).  To overcome the

presumption of an at-will employment relationship, "it is not any single act, phrase or

expression, but the totality of all of these, given the circumstances and the parties' situation

and objectives" that controls.  Kestenbaum v. Pennzoil Co., 766 P.2d 280, 286 (N.M. 1988).

Nevertheless, the terms of an implied contract of employment "must be established with

sufficient specificity that the obligations involved may be ascertained."  Franco v. Phelps

Dodge Corp., 1990 WL 119634 (D.N.M. 1990).

---

  [5] But see footnote 4 supra.

Assuming without deciding that Fisher could and did offer to transfer Dr. Thompson and Dr. Thompson accepted, the Court is unable to identify specific, definite terms of any resulting agreement.  First, Dr. Thompson admits that she understood the difference between classified and unclassified employees, yet she asked to be transferred from the unclassified service to the classified service.  [Doc. 49, Exh. A, March 3, 2004 depo. of Janet L. Thompson at 105; see also Doc. 45, June 28, 2000 memorandum from Jan Thompson, D.V.M. to Robert Hillman, ASD Manager, "I am requesting an immediate transfer into a permanent, classified City position comparable in responsibility and salary to my present position."].  Faced with this request, Defendants believed it would not be possible to accommodate Dr. Thompson.  [Doc. 49 at 20].  Dr. Thompson also argues that her request to be transferred to a classified position did not "negate[] her right to be transferred to *any* position . . . ."  [Doc. 72 at 8] (emphasis in original).  The fact remains, however, that Dr. Thompson asked to be moved into a position that apparently was not available to her.  Based on the complete absence of any specific or certain terms that might support her argument with respect to the creation of an employment contract, the Court rejects Dr. Thompson's breach-of-contract claim and, consequently, her claim for breach of the implied covenant of good faith and fair dealing.  See Azar v. Prudential Ins. Co. of America, 68 P.3d 909, 924 (N.M. Ct. App. 2003) (explaining that state supreme court has refused to recognize a cause of action for breach of an implied covenant of good faith and fair dealing in an at-will employment relationship).

## 2. Equitable Estoppel (Count VIII)

Dr. Thompson's final substantive claim is one for equitable estoppel.  According to Dr. Thompson, "right and justice" dictate that Defendants be estopped from denying her the transfer that she says they promised her at the June 13, 2000 staff meeting.  [See Doc. 1 at 17-18].  Dr. Thompson argues that Defendants' assurance of a transfer amounted to a false representation on which she relied to her detriment.  [Id.; see also Doc. 46 at 15-17].  Defendants argue that estoppel is not appropriate under these circumstances because there was no misrepresentation or concealment of material facts and no change in position on Dr. Thompson's part.  [Doc. 49 at 21-23].

 "'[E]stoppel is the preclusion, by acts or conduct, from asserting a right . . . to the detriment and prejudice of another, who, in reliance on such acts and conduct, has acted thereon.'"  Environmental Control, Inc. v. City of Santa Fe, 38 P.3d 891, 898 (N.M. Ct. App. 2001) (quoting Brown v. Taylor, 901 P.2d 720, 723 (1995)).  However, "[e]stoppel is rarely applied against the state or its governmental entities, and only in exceptional circumstances where there is a shocking degree of aggravated and overreaching conduct or where right and justice demand it."  Id.   A party asserting a claim of equitable estoppel must establish that he or she (1) lacked knowledge of the true facts in question, (2) relied on the estopped party's conduct, and (3) took action that changed his or her position prejudicially.  Green v. New Mexico Human Servs. Dep't, 762 P.2d 915, 916-17 (N.M. Ct. App. 1988).  As for the estopped party, conduct amounting to a false representation or concealment of material facts must be shown, "along with knowledge of true facts and an intention or expectation that the

30

innocent party will act on those representations." Id. at 916.

The Court in this case concludes that Dr. Thompson cannot sustain an estoppel-based claim. For one thing, Dr. Thompson has not demonstrated that Defendants made any false representations or concealed any material facts with respect to the offer to try to transfer those employees who felt they could not implement the HSUS proposals. To the contrary, Dr. Thompson named at least two co-workers who requested and were granted transfers. [Doc. 49, Exh. A, March 3, 2004 depo. of Janet L. Thompson at 105-106]. Dr. Thompson's request, however, was to be moved from an exempt position into a permanent, classified position. [See Doc. 45, June 28, 2000 memorandum from Jan Thompson, D.V.M. to Robert Hillman, ASD Manager]. Dr. Thompson has conceded that she had no right, "contractual or otherwise," to be transferred to a classified position. [Doc. 72 at 1]. Yet a classified position is what she requested. Additionally, Defendant Rael testified that other veterinarian positions were considered for Dr. Thompson, but that there was either no fit or no opportunity. [Doc. 49, Exh. J, March 30, 2004 depo. of Lawrence Rael at 26]. In light of these facts, the Court is unable to find that Defendants falsely represented or concealed any material facts concerning a possible transfer, and certainly cannot find that Defendant engaged in a "shocking degree of aggravated and overreaching conduct." See Environmental Control, Inc., 38 P.3d at 898.

**D.  Punitive Damages (Count IX)**

Dr. Thompson seeks the imposition of punitive damages against the individual Defendants on the ground that their actions were intentional, malicious, and recklessly

indifferent toward her.  [Doc. 1 at 18-19].  Defendants move to dismiss this count, arguing that (1) there is no basis for individual liability against them under 42 U.S.C. § 1983, and (2) their conduct in this matter was not intentional, malicious, or reckless.  [Doc. 5 at 20].

Punitive damages are available to a plaintiff who demonstrates that he or she has suffered retaliation in violation of her First Amendment rights.  Wren v. Spurlock, 798 F.2d 1313, 1322 (10th Cir. 1986) (awarding $7,500 in punitive damages to public school teacher who was harassed and disciplined after she wrote letter to state education association suggesting investigation of school principal).  Because the allowance of punitive damages "inherently involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent . . . the infliction of such damages, and the amount thereof when inflicted, are of necessity within the discretion of the trier of fact."  Miller v. City of Mission, Kan., 705 F.2d 368, 377 (10th Cir. 1983).  As stated above, Dr. Thompson may go forward with prosecute her First Amendment claims against Defendants Fisher and Kotchian.  Because the precise nature of their conduct will be for a jury to decide, Defendants motion to dismiss Dr. Thompson's claim for punitive damages, to the extent it is asserted against Fisher and Kotchian, is denied.  See id.

## III.  CONCLUSION

For the foregoing reasons, the Court concludes that *Defendants' Motion to Dismiss* is due to be **granted in part** and **denied in part**; *Plaintiff's Motion for Summary Judgment on Counts VI, VII and VIII* is due to be **denied**; and *Defendants' Motion for Summary Judgment* is due to be **granted in part** and **denied in part**.  The claims that remain viable

following the disposition herein of the parties' motions are Dr. Thompson's claims of retaliation in violation of the First Amendment as asserted in Count I against Defendants Fisher, Kotchian, and the City of Albuquerque, and her claim for punitive damages against Fisher and Kotchian.

**IT IS, THEREFORE, ORDERED** that *Defendants' Motion to Dismiss* [Doc. 4] is **DENIED** with respect to Dr. Thompson's claims of retaliation in violation of the First Amendment.

**IT IS FURTHER ORDERED** that *Defendants' Motion to Dismiss* [Doc. 4] is **DENIED** to the extent that Defendants Fisher and Kotchian assert entitlement to qualified immunity.

**IT IS FURTHER ORDERED** that *Defendants' Motion to Dismiss* [Doc. 4] is **DENIED** with respect to the issue of the City of Albuquerque's immunity.

**IT IS FURTHER ORDERED** that *Defendants' Motion to Dismiss* [Doc. 4] is **DENIED** with respect to the issue of punitive damages against Defendants Fisher and Kotchian.

**IT IS FURTHER ORDERED** that *Defendants' Motion to Dismiss* [Doc. 4] is otherwise **GRANTED.**

**IT IS FURTHER ORDERED** that *Plaintiff's Motion for Summary Judgment on Counts VI, VII and VIII* [Doc. 45] is **DENIED.**

**IT IS FURTHER ORDERED** that *Defendants' Motion for Summary Judgment*

[Doc. 48] is **DENIED** with respect to Dr. Thompson's claims of retaliation in violation of the First Amendment.

      **IT IS FURTHER ORDERED** that *Defendants' Motion for Summary Judgment* [Doc. 48] is **DENIED** to the extent that Defendants Fisher and Kotchian assert entitlement to qualified immunity.

      **IT IS FURTHER ORDERED** that *Defendants' Motion for Summary Judgment* [Doc. 48] is **DENIED** with respect to the issue of the City of Albuquerque's immunity.

      **IT IS FURTHER ORDERED** that *Defendants' Motion for Summary Judgment* [Doc. 48] is otherwise **GRANTED.**

      **SO ORDERED** this 20th day of July, 2004, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

34